# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DANNY R. SINCLAIR,

        Plaintiff,

v.                      **CIVIL ACTION NO. 1:04CV165**
                                **(Judge Keeley)**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

        Defendant.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## <u>REPORT AND RECOMMENDATION</u>

Pursuant to 28 U.S.C. §636(b)(1)(B), Rule 72(b), Federal Rules of Civil Procedure and Local Court Rule 4.01(d), on July 28, 2004, the Court referred this Social Security action to United States Magistrate John S. Kaull with directions to submit proposed findings of fact and a recommendation for disposition. On August 9, 2005, Magistrate Kaull filed his Report and Recommendation and directed the parties, in accordance with 28 U.S.C. §636(b)(1) and Rule 6(e), Fed. R. Civ. P., to file any written objections with the Clerk of Court within ten (10) days after being served with a copy of the Report and Recommendation. On August 22, 2005, plaintiff, Danny R. Sinclair, through counsel, Michael Miskowiec, filed objections to the Magistrate's Report and Recommendation.

**I.**

On January 24, 2001, Danny R. Sinclair ("Sinclair") filed an application for Disability Insurance Benefits alleging disability

as of June 30, 2001, due to chronic upper left back pain, sleep apnea, peptic ulcer, gastroesophageal reflux disease ("GERD"), and high cholesterol. The Commissioner denied the application initially and on reconsideration. Sinclair requested a hearing and, on November 10, 2003, an Administrative Law Judge ("ALJ") held a hearing at which Sinclair, represented by a non-attorney benefits representative, testified. A Vocational Expert ("VE") also testified.

On December 4, 2003, the ALJ determined that Sinclair was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision. The Appeals Council denied Sinclair's request for review, making the ALJ's decision the final decision of the Commissioner. On July 28, 2004, Sinclair filed this action seeking review of the final decision.

**II.**

On December 4, 2003, the date of the ALJ's decision, Sinclair was 57 years. He has a high school education and past work history as an operations supervisor for the West Virginia University personal rapid transit system ("PRT"). On June 30, 2001, Sinclair retired from his job "because he was concentrating more on his pain than on what he was doing."

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

---

### III.    ADMINISTRATIVE FINDINGS

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ found:

1.    Sinclair met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision;

2.    Sinclair has not engaged in substantial gainful activity since the alleged onset of disability;

3.    Sinclair has a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b) which do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4;

4.    Sinclair's allegations regarding his limitations were not totally credible for the reasons set forth in the body of the decision;

5.    After careful consideration of all of the medical opinions in the record regarding the severity of Sinclair's impairments, he retains the residual functional capacity and ability to do a range of light work with a sit/stand option, occasional climbing, balancing, stooping, kneeling, crouching, or crawling, no concentrated exposure to extreme cold, workplace hazards such as unprotected heights or dangerous moving machinery, and dust, fumes, gases or other pulmonary irritants, and ability to be able to miss up to two days of work per month;

6.    Sinclair's past relevant work as Operations Supervisor for PRT did not require the

performance of work-related activities precluded by his residual functional capacity (20 CFR §404.1565);

7.    Sinclair's medically determinable osteoarthritis, nodules in lungs, sleep apnea, bilateral epicondylitis, depression and anxiety do not prevent the claimant from performing his past relevant work; and

8.    Sinclair has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(e)).


IV.

Sinclair objects to the Magistrate Judge's report and recommendation, alleging that: 1) the record does not support the Magistrate Judge's determination that the "new evidence" demonstrating a total left knee replacement four days after the ALJ's decision would not have changed the decision; 2) the ALJ failed to indicate any limitations resulting from Sinclair's depression and anxiety; and 3) the ALJ failed to consider whether even mild mental limitations, although severe in combination with the other impairments, would prohibit Sinclair from performing his past relevant work.

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

### V.  MEDICAL EVIDENCE

The medical evidence of record includes:

1.    A May 5, 1997, report from Physical Therapist Debbie Cook indicating that Sinclair had been seen three times a week, that there had been no significant change in his back pain, and that he continued to report that sitting increased his pain which worsened by the end of the day.  His treatment consisted of moist heat, back stretches, strengthening, high volt galvanic stimulation, cold packs and ultrasound.  He reported no difficulty performing his exercises;

2.    An August 8, 2000, office note from C. Brian Arthurs, M.D., indicating a follow-up for a diagnosis of chronic low back pain and prescriptions for Oxycontin and Vioxx;

3.    A May 14, 2001, office note from Dr. Arthurs indicating diffuse tenderness in the lumbar sacral musculature, mild tenderness over the spinous process and decreased range of motion on forward and backward bending.  Diagnosis was chronic low back pain and GERD, stable. Dr. Arthurs prescribed OxyContin, Oxycodone and Prilosec;

4.    A June 13, 2001, office note from Dr. Arthurs indicating complaints of GERD and chronic low back pain.  Examination revealed

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

back with diffuse tenderness to palpation, negative straight leg raises and stable GERD while on Prilosec;

5.   An August 8, 2001, office note from Dr. Arthurs indicating complaints of chronic low back pain and umbilical hernia;

6.   A February 28, 2002, office note from Dr. Arthurs indicating complaints of a "long history of chronic low back pain," tenderness throughout his back and decreased range of motion in the hips;

7.   An April 3, 2002, office note from Dr. Arthurs indicating chronic low back pain that caused Sinclair "to feel down and depressed about this." Examination revealed diffuse tenderness throughout his back. Dr. Arthurs assessed chronic low back pain secondary to degenerative disc disease/arthritis;

8.   An April 8, 2002, report from C. Andrew Heiskell, M.D., indicating complaints of an umbilical hernia for the past nine months which Sinclair believed occurred when he was doing some roofing work. Sinclair reported that he had "gained 30 pounds since he retired 9 months ago", denied any dyspnea, dyspnea on exertion or chronic cough, denied any claudication, joint pain or

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

difficulty with gait, denied anxiety or depression and denied weakness or fatigue.

Examination revealed a 6'1", 257 pounds, male with clear lungs with no wheezing, rales or rhonchi, with normal gait and station and full range of motion who was fully oriented and displayed an appropriate affect. Dr. Heiskell diagnosed an umbilical hernia;

9.   An April 9, 2002 report from a chest CT indicating multiple nodules and diffuse ground-glass opacity bilaterally in the lungs;

10.   An April 12, 2002 report from the West Virginia Pain Treatment Center indicating a chief complaint of chronic upper left back pain.  Examination revealed normal gait, cervical range of motion, flexion, and extension, and no trigger points, no muscular laxity or instability in the upper extremities, muscle strength of 5/5 and no sensory deficits. Sinclair did note that an MRI of the thoracic spine noted an abnormal increased signal in the T2 weighted images of uncertain significance and was otherwise normal, a normal lumbar spine MRI and a normal bone scan.  The diagnosis was chronic back pain. Sinclair received prescriptions for Effexor with Zanaflex for sleep and was advised to follow up with a chiropractor and to become involved in a fitness program;

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

11.  An April 26, 2002, consultative report from Steven L. Maxwell, D.O., F.C.C.P.. indicating Sinclair reported a medical history of hyperlipidemia, GERD, peptic ulcer disease, anxiety, depression, umbilical hernia, midback left pain, and hernia surgery.  He also reported being very anxious and nervous and depressed due to pain;

12.  An April 29, 2002, office note from Dr. Arthurs indicating a follow-up examination regarding chronic low back pain secondary to degenerative changes in his back.  Dr. Arthurs continued percocet, oxycontin, referred Sinclair to the pain clinic, and suggested a repeat MRI of LS spine might be needed;

13.  An April 30, 2002, report of operation from C. Andrew Heiskell, M.D., indicating surgery to repair an umbilical hernia. Dr. Heiskell noted in a pre-surgery screening that Sinclair reported  fatigue, sleep apnea, left upper back pain, but no arthritis, deformities, muscle weakness or bone disease;

14.  A May 21, 2002, report of clinical polysomnography (sleep study) from Dr. Steven Maxwell indicating complaints of excessive daytime sleepiness.  The report revealed that Sinclair's untreated sleep efficiency was poor, with a total of 613 respiratory events (229  central,  127  obstructive,  152  mixed,  and  105  partial

obstructive apneas).    Dr. Maxwell diagnosed severe obstructive
sleep apnea syndrome and recommended Sinclair fill out a 14-day
sleep diary, return to the sleep center for a trial of a nasal CPAP
or BiPAP machine and begin a weight reduction program. Dr. Maxwell
noted that "[e]ven a mild to moderate weight loss should result in
significant improvement in the patient's nocturnal respiratory
events";

15.    An October 10, 2002, letter from Dr. Maxwell indicating
that the small nodules in Sinclair's chest were unchanged and had
been stable for well over six months. Sinclair reported that he had
delayed any further tests or therapy for his sleep apnea due to
concern about his wife's health; that he had significant back pain;
that he had not seen his pain specialist lately; and that he was
very nervous and anxious about his wife as well as additional
nervousness and mood fluctuation due to his chronic pain.
Examination revealed weight at 274 and clear lungs.

Dr. Maxwell determined that Sinclair had exertional dyspnea,
abnormal chest x-ray, severe obstructive sleep apnea, chronic
rhinitis, hiatal hernia, and morbid obesity. He stated that the
sleep apnea put Sinclair "at a highly dysfunctional status with the
high risk factors."   The doctor discussed various treatments for

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

sleep apnea including BiPAP, CPAP, dental appliance, UPPP and bimaxilla advancement and strongly encouraged Sinclair to lose weight and stop smoking. Sinclair agreed to proceed with therapeutic intervention and with ordering a CPAP/BIPAP device;

16.  A November 5, 2002, sleep study, six months after the first indicating that, even with the CPAP, his sleep efficiency was considered low. He slept for 4.8 out of 6.3 hours in bed. His apnea events were greatly lessened to 41 (35 central, 0 obstructive, 2 mixed, and 4 partial obstructive.) Dr. Maxwell determined that Sinclair had obstructive sleep apnea syndrome which is a change from his determination on May 21, 2002 because he omitted the word "severe".

Dr. Maxwell again recommended weight loss and advised that even a mild to moderate weight loss should result in significant improvement, recommended counseling regarding good sleep hygiene, continuation of the nasal CPAP machine and a return to the sleep center in 6-12 months to determine if the current levels were still appropriate to control his sleep apnea;

17.  A December 20, 2002, office note from Dr. Arthurs indicating continued low back pain causing Sinclair to feel

terrible and noting that Sinclair reported the pain was "there all
the time";

18.  A January 24, 2003 Disability Report Sinclair completed
indicating the "illnesses, injuries or conditions that limit[ed]
[his] ability to work" were "chronic back pain (upper left side),
sleep apnea, ulcer, reflux disease, high cholesterol".

Sinclair reported that he retired from his job in June 2001
due to the back pain that caused him to become more irritable with
his co-workers even though he had changed shifts hoping that less
stress would ease his back pain. He also alleged that the
medications affected his decision making at times and that the pain
affected his quality of work.

Sinclair described his former job as "sitting and standing
while responding to anomalous conditions and alarms that occur in
operating a computer automated transportation company", using
technical knowledge and skills in writing and completing reports,
no lifting or carrying, supervising 8 - 20 employees and making
recommendations regarding hiring and firing. He noted that he had
not seen a doctor or mental health professional for the emotional
or mental problems that he alleged limited his ability to work.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Sinclair noted that he needed no help with his personal needs or grooming, except for sometimes being unable to tie his shoes, was able to prepare cereal for breakfast, sandwiches for lunch and frozen dinners and salads for dinner but was unable to stand long enough to cook full course meals, could do laundry, pay bills, perform household repairs, take care of the lawn, wash the car, manage the bank accounts, take out the trash, shop for "maybe a couple of hours" at a time for food, clothing and medications and watched television 10 - 12 hours per day. Sinclair did note that mowing the grass, making the house repairs and taking care of the car now took longer. He also indicated that he no longer had any hobbies or interests due to his back pain and that he had problems concentrating due his back pain;

19. A February 4, 2003, Personal Pain Questionnaire Sinclair completed indicating a continual aching and burning pain in the upper left side of his back which medication sometimes helped but that the medications caused him to be irritable, tired, drowsy and unable to concentrate for any length of time. He did not list anything under "Second Pain" or "Third Pain."

Under Work History, Sinclair reported that his job required ½ hour of walking, two hours of standing, and five hours of sitting

12

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

per day, with no climbing, stooping, kneeling, crouching, or crawling. He reported that he supervised operations, investigated and corrected equipment failures, and wrote reports and forms;

20. A February 4, 2003, follow-up visit note from West Virginia Pain Treatment Center indicating increased low back pain and recommending treatment with massage and TPI and noting that Sinclair had not been seen since April 2002;

21. A February 11, 2003, physical Residual Functional Capacity Assessment ("RFC"), from Hugh M. Brown, M.D., a state agency reviewing physician, indicating Sinclair was limited to lifting 20 pounds occasionally, 10 pounds frequently, standing or walking about six hours, sitting about six hours in an eight hour workday and no other limitations except for avoiding hazards due to sleep apnea with daytime somnolence;

22. A February 19, 2003, Psychiatric Review Technique ("PRT"), from Joseph Kuzniar, Ed.D., a state agency reviewing psychologist, indicating an affective disorder and anxiety disorder but no severe mental impairment. Dr. Kuzniar noted that Sinclair had mild restriction of activities of daily living, mild difficulty in maintaining social functioning, mild difficulty in maintaining concentration, persistence and pace and no episodes of

decompensation. Dr. Kuzniar noted the record did not contain anything demonstrating that Sinclair had any severe difficulty with depression or anxiety;

23. A March 7, 2003, follow-up visit note from the West Virginia Pain Treatment Center indicating that pain injections and massage therapy had not helped his back and the impression remained chronic back pain;

24. A March 14, 2003, office note from Dr. Arthurs indicating Sinclair reported continuing back pain, that trigger point injections provided little or no relief, and that he did not feel the narcotics were helping much and wanted to reduce them. The assessment was muscle spasm, history of hiatal hernia and ulcers, chronic low back pain, and hyperlipidemia;

25. A May 2, 2003, report from a MRI of the lumbosacral spine indicating no evidence of herniation, a minimal central right lateral bulge at L5-S1 with no significant stenosis, and a small hemangioma in the LS vertebral body. The MRI was considered "Essentially unremarkable study for age";

26. A May 2, 2003, office note from Dr. Arthurs indicating complaints of swollen and tender left elbow, swelling of the left knee, head congestion, irritated nasal passages and a sore throat.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Dr. Arthurs diagnosed sinusitis, a slightly swollen left knee which might involve meniscal damage and left arm bursitis. Dr. Arthurs referred him to Dr. O'Malley regarding the left knee and the left elbow;

27. A May 8, 2003, office note from Steven L. Maxwell, D.O., pulmonary and critical care specialist, indicating a follow up appointment due to an abnormal chest x-ray, sleep apnea, chronic rhinitis and "other problems". Sinclair reported his activity level varied based upon the amount of back pain he was experiencing and that he tried to "get out in the yard and . . . also work around the house, as much as the back [would] allow." He reported continuing daytime fatigue and stated he was not using the CPAP machine because of his back pain. He noted that he retired with the mask on, would wear it for a short while, take it off when the back pain woke him, and go back to bed. He also reported being very anxious and nervous.

Examination revealed a weight of 297 pounds, clear lungs severe sleep apnea, dyspnea, chronic rhinitis, morbid obesity, GERD and an abnormal chest x-ray. The doctor advised Sinclair to try to wear his CPAP mask more often and that he was a good candidate for two different surgical treatments for sleep apnea. Sinclair stated

he would think about the alternative treatments and let the doctor know if he was interested and would work on losing weight;

28. A May 28, 2003, Psychiatric Review Technique ("PRT") from Samuel Goots, Ph.D., a state agency reviewing psychologist, indicating Sinclair had an affective disorder and an anxiety-related disorder and that neither disorder was severe. Dr. Goots indicated Sinclair had mild functional limitations in activities of daily living, maintaining social functioning and maintaining concentration, persistence and pace and had had no episodes of decompensation;

29. A May 29, 2003, RFC from Cynthia Osborne, D.O., a state agency reviewing physician, indicating Sinclair could lift 20 pounds occasionally, could lift 10 pounds frequently, could stand or walk six hours in a workday, could sit six hours in a workday, could only occasionally perform postural movements, and should avoid concentrated exposure to extreme cold and hazards. Dr. Osborne reduced Sinclair's RFC to light;

30. A May 20, 2003, letter from Gregg O'Malley, M.D., an orthopedic surgeon, indicating complaints of left knee and left elbow pain. The elbow pain was "worse with dorsiflexion against resistance or heavy lifting." Sinclair told the doctor that if he

16

lifted in a supinated position, it did not hurt nearly as badly.

Dr. O'Malley discussed treatment options, and noted

> Since it's not a dangerous problem, he chooses
> to treat it like the cave men by avoiding
> strenuous activities with that arm and letting
> nature fix the rest. His other alternatives
> would be non-steroidal's injections, or
> surgery.

Dr. O'Malley also noted that Sinclair had pain in his left

knee along with "a fairly tense effusion" which was worse with

activity and only partially relieved by rest. Dr. O' Malley's

clinical impression was

> Knee pain, probably from modest arthrosis vs a
> degenerative meniscus tear. I discussed
> diagnostic and treatment options. He has
> elected just to go ahead with an intrarticular
> injection of the left knee today with
> DepoMedrol and 1/2% Marcaine. He did try some
> of his wife's Celebrex and said that it worked
> pretty well but he prefers not to start on
> pills yet. I will see him back in the office
> in four weeks and continue to update you.

Dr. O'Malley also noted Sinclair's right knee was asymptomatic.

His examination showed moderate effusion and increased warmth and

tenderness of the left knee, but good ligamentous stability. The

knee had normal motion. X-rays showed "a little bit of medial

compartment arthrosis consistent with his age," but no other

abnormalities;

17

31.  A June 17, 2003, office note from Dr. O'Malley indicating Sinclair did very well with his first left knee injection, had no effusion or synovitis and had good range of motion.  Dr. O'Malley further noted that Sinclair complained that his right knee was just "starting to act up" and reported he had the same symptoms as on the left.  On examination, the right knee had no findings or symptoms suggesting ligamentous pathology or meniscal pathology, no instability, effusion or synovitis, and had just a slight increase in warmth.  The hip exam was benign and Sinclair continued to have negative straight leg raising. Dr. O'Malley discussed treatment options and, upon Sinclair's request, gave an injection in the right knee of Depo-Medrol and 1/2% Marcaine;

32.  A July 3, 2003, office note from Dr. O'Malley indicating Sinclair had about a month of relief from the knee injections but now both knees were hurting.  Examination revealed moderate effusion, good range of motion, slight crepitus, no hip irritability and negative straight leg raises. Dr. O'Malley again discussed treatment options and Sinclair elected to stay with injections;

33.  A July 7, 2003, office note from Dr. Arthurs indicating a follow-up appointment regarding his chronic low back pain.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Sinclair reported that he had completely stopped taking Oxycontin, and that now his back was killing him, that he was feeling down and depressed and that he had gained weight because he quit smoking. The diagnosis was chronic low back pain secondary to degenerative disc disease, depression, and GERD. Dr. Arthurs prescribed an increase in Lortab and Celebrex, Lexapro for the depression and Prilosic;

34. A July 28, 2003, office note from Dr. Arthurs indicating complaints of continuing severe low back pain and discomfort. Examination revealed a decreased range of motion of the back. The diagnosis was chronic low back pain, GERD, and borderline high blood pressure. Dr. Arthurs prescribed an increase in the Lortab, a referral back to the pain clinic, continuation of Prilosic, weight loss and a re-evaluation in 4-6 weeks;

35. A August 5, 2003, office note from Dr. O'Malley indicating Sinclair received "fairly good relief of his knee pain, but only for a short period of time with each injection". Examination revealed synovitis, effusion, crepitus, and slightly decreased range of motion. Dr. O'Malley advised Sinclair that, if he did not start getting long term relief from the injections, the next step would be arthroscopie debridment;

36.   A September 8, 2003, preoperative history from Dr.
O'Malley indicating Sinclair was to have arthroscopic surgery on
his left knee in September 2003 due to problems with increasing
pain and discomfort and decreased range of motion.   Dr. O'Malley
noted that Sinclair currently "d[id] not have a lot of other
significant complaints or problems."   Sinclair specifically denied
any chest pain, shortness of breath, or dyspnea on exertion.
Examination revealed Sinclair's left knee showed decreased range of
motion with some crepitus and mild swelling. Dr. O'Malley diagnosed
osteoarthritis, GERD, history of depression – stable on medication,
hyperlipidemia, and dermatitis.

Dr. O'Malley noted Sinclair's knee looked "pretty bad" before
the surgery, with "terrible arthritis especially at the medical
compartment, which [was] all the way down to eburnated bone."   Two
weeks after the surgery Sinclair reported feeling better but not
yet perfect.   Dr. O'Malley noted that future options included total
knee arthroplasty, but Sinclair did not feel ready for that yet;

38.   A December 8, 2003 report of operation from Dr. Gregg
O'Malley indicating a total left knee replacement; and

39.   A December 11, 2003 discharge summary from Monongalia
General Hospital indicating Sinclair "underwent the operative

procedure without complications." Examination revealed no pedal edema, no sign of deep vein thrombosis or phlebitis, clean and dry wound and no sign of infection. The summary also indicated that Sinclair was "progressing very well in physical therapy."

## VI. DISCUSSION

### A.

Sinclair objects to the Magistrate Judge's report and recommendation, alleging that the record does not support the Magistrate Judge's determination that the "new evidence" demonstrating a total left knee replacement four days after the ALJ's decision would not have changed the decision. Sinclair contends that this new evidence would have warranted a change in that decision.

In <u>Wilkins v. Secretary</u>, 953 F.2d 93, 95 (4th Cir. 1991), the Fourth Circuit held:

> (a) The Appeals Counsel will review a case if

> . . .

> (b) If new and material evidence is submitted, the Appeals Council *shall consider* the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council *shall evaluate the entire*

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

> *record including the new and material evidence*
> submitted if it relates to the period on or
> before the date of the administrative law
> judge hearing decision. It *will then review*
> the case if it finds that the administrative
> law judge's action, findings, or conclusion is
> contrary to the weight of the evidence
> currently of record.

(Emphasis in original).

<u>Wilkins</u> defines the terms "new" and "material" as follows:

> Evidence is new . . . if it is not duplicative
> or cumulative . . . . . Evidence is material if
> there is a reasonable possibility that the new
> evidence would have changed the outcome.

<u>Id</u>. at 93.

<u>Wilkins</u> also provides:

> Because the Appeals Council denied review, the
> decision of the ALJ became the final decision
> of the Secretary. 'Reviewing courts are
> restricted to the administrative record in
> performing their limited function of
> determining whether the Secretary's decision
> is supported by substantial evidence.' The
> Appeals Council specifically incorporated [the
> new evidence] into the administrative record.
> Thus, we must review the record as a whole,
> including the new evidence, in order to
> determine whether substantial evidence
> supports the Secretary's findings.

<u>Id</u>. at 96.

Here, the Magistrate Judge determined that the evidence
regarding Sinclair's knee surgery was "new" and related to the

22

period at issue. The Magistrate Judge then noted that the Appeals Council had considered this evidence, had included it in the transcript and subsequently had denied Sinclair's request for review finding that the evidence would not have changed the ALJ's decision. The Appeals Council specifically noted:

> In looking at your case, we considered the additional evidence listed on the enclosed Order of Appeals Council. We found that this information does not provide a basis for changing the Administrative Law Judge's decision.

Thus, as in _Wilkins_, the Appeals Council considered the new evidence, included it in the record and subsequently denied review. Therefore, pursuant to _Wilkins_, the reviewing court must consider the record as a whole, including the new evidence, in order to determine whether the ALJ's decision is supported by substantial evidence in the record.

The Magistrate Judge reviewed all of the evidence of record and noted that the first mention of knee pain occurred in February, 2003. The first complaint regarding knee pain occurred on May 20, 2003. At that time, the doctor diagnosed knee pain, probably from modest arthrosis versus degenerative meniscus tear. Examination revealed moderate effusion, increased warmth and normal

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

motion. X-rays indicated a "little bit of medial compartment arthrosis consistent with age" and no other abnormalities.

Sinclair stated that he had tried his wife's Celebrex which provided some help but that he did not want to start pills at this time. As previously noted, Dr. O'Malley indicated that injections provided relief for approximately one month at a time. In September 2003, only seven months after the first mention of knee pain, Dr. O'Malley performed surgery on Sinclair's left knee. Two weeks after the surgery, Sinclair reported feeling better but not "perfect".

An impairment is considered to be disabling if the individual is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that is expected to last for a continuous period of not less than twelve months. There is no indication in the record from any medical source regarding the length of time associated with Sinclair's knee pain. It is important to note that there is only a seven month period of time from the first mention of knee pain until the surgery in September, 2003, only a nine month period of time from the first mention of knee pain until the hearing in November 2003, and only a ten month

period of time from the first mention of knee pain until the total left knee replacement in December, 2003. It is also significant that Sinclair did not list knee pain as an impairment on his application for DIB and testified that he quit his job due to back pain which he felt was affecting his ability to perform his duties and to concentrate.

The ALJ performed the required five-step evaluation pursuant to 20 C.F.R. §§ 404.1520 and, as noted, determined that Sinclair retained the residual functional capacity to perform his past relevant work. Although he reviewed all of the evidence contained in the record, the ALJ specifically noted: 1) the February 11, 2003, report from Dr. Brown, a state agency reviewing physician, indicating Sinclair was limited to lifting 20 pounds occasionally, 10 pounds frequently, standing or walking about six hours, sitting about six hours in an eight hour workday and no other limitations except for avoiding hazards due to sleep apnea with daytime somnolence; and 2) the May 29, 2003, report from Cynthia Osborne, D.O., a state agency reviewing physician, indicating Sinclair could lift 20 pounds occasionally, could lift 10 pounds frequently, could stand or walk six hours in a workday, could sit six hours in a workday, could only occasionally perform postural movements, should

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

avoid concentrated exposure to extreme cold and hazards and reduced

his RFC to light. The ALJ also considered Sinclair's own testimony

regarding his activities of daily living and the testimony of the

VE who stated that Sinclair retained the residual functional

capacity to perform his past relevant work.

Following his review of the entire record, the ALJ determined

that:

> Although the claimant undeniably has
> difficulty with his left knee, he has recently
> had helpful surgery, and any remaining
> difficulty should be ameliorated by modifying
> the light residual functional capacity to
> include a sit/stand option.
>
>                    . . .
>
> Accordingly, the undersigned finds the
> claimant retains the following residual
> functional capacity: the claimant retains the
> ability to do a range of light work with a
> sit/stand option; the claimant may not be
> required to climb, balance stoop, kneel,
> crouch or crawl on more than an occasional
> basis; the claimant should avoid concentrated
> exposure to extreme cold, workplace hazards
> such as unprotected heights or dangerous
> moving machinery, and dust, fumes, gases or
> other pulmonary irritants; the claimant should
> be able to miss up to two days of work a
> month.

It is clear that the Magistrate Judge reviewed the record as

a whole as required in <u>Wilkins</u> and determined that the new evidence

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

would not have warranted a change in the ALJ's determination that Sinclair was capable of performing his past relevant work. The Court agrees.

B.

Sinclair objects to the Magistrate Judge's report and recommendation alleging that the ALJ failed to indicate any limitations resulting from his depression and anxiety and failed to consider whether even mild mental limitations, although severe in combination with the other impairments, would prohibit him from performing his past relevant work. Sinclair argues that the ALJ's findings concerning the functional impact of his depression and anxiety are inconsistent.

The ALJ stated:

> Finally, the claimant has been diagnosed with depression and anxiety. As more fully set forth below, however, I find that the functional limitations associated with the claimant's mental impairments when evaluated under the 'B' and 'C' criteria do not rise to the level of a severe impairment.

20 C.F.R. Pt. 404, Subpt P, App1, Listing 12.06 provides:

> Anxiety Disorders: In these disorders, anxiety is either the predominant disturbance or is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic

27

disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied:

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a, motor tension; or
b. Autonomic hyperactivity; or
c. Apprehensive expectation; or
d. Vigilance and scanning;

OR

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic

experience, which are a source of
marked distress;

AND

B. Resulting in a least two of the following:

1. Marked restriction of activities of
daily living; or

2. Marked difficulties in maintaining
social functioning; or

3. Marked difficulties in maintaining
concentration, persistence or pace; or

4. Repeated episodes of decompensation
each of extended duration.

OR

C. Resulting in complete inability to function
independently outside the area of one's own
home.

The ALJ reviewed and considered Sinclair's activities of daily
living, which included cleaning, shopping, cooking, paying bills,
caring for his own personal needs, washing clothes, taking out the
trash, mowing the lawn, driving, and managing the household
finances. The ALJ noted that there were no medical findings of
significant problems with concentration, that Sinclair did not seek
treatment from a mental health provider and that in September 2003,

his family doctor noted only a "History of depression, on Lexapro 10 mg. daily and stable".

Significantly, both state agency reviewing psychologists determined that Sinclair did not have a severe mental impairment. As previously noted, Dr. Kuzniar indicated only mild restriction of activities of daily living, mild difficulty in maintaining social functioning, mild difficulty in maintaining concentration, persistence and pace and no episodes of decompensation and Dr. Goots also indicated Sinclair had mild functional limitations in activities of daily living, maintaining social functioning and maintaining concentration, persistence and pace and had had no episodes of decompensation. 20 CFR § 404.1527(f)(2)(i) provides that State agency psychological consultants are highly qualified psychologists who are also experts in Social Security disability evaluations. Accordingly, the ALJ considered these opinions as required and noted that the record did not contain any contradictory persuasive evidence.

At Step Three of the sequential analysis, the ALJ did determine that Sinclair's anxiety and depression *in combination with all his other impairments* were severe. In Gross v. Heckler, 785 F.2d 1163 (4th Cir. 1986), the Fourth Circuit stated that a mere

diagnosis of a condition is not enough to prove disability and that there must be a showing of related functional loss.

Significantly, there is no evidence in the record of any functional limitations related to Sinclair's mental impairments. Moreover, Sinclair's own doctor stated only that he had a "history of depression," and that it was stable on medications. Accordingly, the Magistrate Judge determined that the record contained substantial evidence to support the ALJ's determination that Sinclair did not have a severe mental impairment and that there were no functional limitations related to his depression or anxiety. The Court agrees.

## VII. <u>CONCLUSION</u>

Upon examination of the plaintiff's objections, the Court concludes that Sinclair has not raised any issues that were not thoroughly considered by the Magistrate Judge in his report and recommendation. Moreover, upon an independent <u>de novo</u> consideration of all matters now before it, the Court is of the opinion that the Report and Recommendation accurately reflects the law applicable to the facts and circumstances before the court in this action. Therefore, it is

SINCLAIR V. BARNHART

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

**ORDERED** that Magistrate Kaull's Report and Recommendation is accepted in whole and that this civil action be disposed of in accordance with the recommendation of the Magistrate. Accordingly,

1. the defendant's motion for Summary Judgment (Docket No. 8) is **GRANTED**;

2. the plaintiff's motion for Summary Judgment (Docket No. 5) is **DENIED**; and

3. this civil action is **DISMISSED WITH PREJUDICE** and **RETIRED** from the docket of this Court.

The Clerk of Court is directed to enter a separate judgment order. Fed.R.Civ.P. 58.

The Clerk of the Court is directed to transmit copies of this Order to counsel of record.

DATED: September _____27_____, 2005.

_Irene M. Keeley_
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE